UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

GEORGIA SIPPLE,

      Plaintiff,

    v.

CROSSMARK, INC., et al.,

      Defendants.

No. 2:10-cv-00570-MCE-KJM

**MEMORANDUM AND ORDER**

----oo0oo----

In her complaint, Plaintiff Georgia Sipple ("Sipple" or "Plaintiff") alleges that Defendants Crossmark, Inc. and Cindy Slinker[1] (collectively "Crossmark" or "Defendant"), failed to properly accommodate her disability, retaliated against her as a result of her voicing her concerns about being accommodated, and failed to engage in an interactive process with her to resolve her concerns, all of which are alleged to be in violation of common law and the California Fair Employment and Housing Act ("FEHA").

---

[1] Cindy Slinker is a Human Resources Manager for Crossmark.

1

California Government Code § 12900-12996.[2]  This case was removed to this Court on the basis of diversity jurisdiction.  Crossmark now moves, pursuant to Federal Rule of Civil Procedure 56, for summary adjudication as to all claims submitted by Plaintiff on grounds that said claims are either legally deficient, factually lacking, or both.  As set forth below, Defendants' Motion will be granted in full.

**BACKGROUND**

Crossmark is a sales and marketing agency which provides various marketing services for manufacturers and retailers.[3] (Plaintiff Sipple's Statement of Undisputed Facts in Opposition to Defendant Crossmark's Statement of Undisputed Facts ("P-SUF") ECF No. 20, at ¶ 1.)  In 2009[4], Sipple, employed as a product demonstrator for Crossmark, was placed in a Walmart to demonstrate the use of and ultimately sell various products including raw foods.[5]  (P-SUF at ¶¶ 3, 9.)

///
///

---

[2] All further references to the California Government Code will be abbreviated as "Cal. Gov. Code".

[3] It is noted when the parties disagree on some facts. When disputes are not noted, the facts as stated are the Court's determination of what is to be considered undisputed.

[4] All dates in this section are from 2009 unless otherwise stated.

[5] All of the employers and supervisors referred to in this order are Crossmark employees.

Sipple was aware of a dress code adopted by Crossmark and applied to product demonstrators.[6] (Deposition of Georgia Sipple ("Sipple Dep.") ECF No. 15, Exh. A-1-A at 61:7-21.)

During the course of her employment with Crossmark, Sipple began to experience menopausal symptoms, including "hot flashes", dizziness, migranes and a general sense of physical weakness. (P-SUF at ¶¶ 12, 13.)  On April 28, Sipple's physician, Dr. Raitt, confirmed that Sipple was experiencing menopausal symptoms.  (Id. at ¶ 17.)  Sipple then requested a note from Dr. Raitt regarding the effects to relay to Crossmark.  (Id.)  She received the note from her doctor on that day, which said, in relevant part:

> Due to medical conditions, Georgia Sipple needs allowances in dress code. She needs to use short sleeve shirts, shorts or short knee high skirts. She also is unable to wear clothing with collars or straps on the neck or hats.[7]

(Exhibits 1-6 re Defendant Crossmark's Motion to Dismiss ("Ex. 1-6 re MSJ") ECF No. 22, Ex. 2.)

Sipple thereafter deviated from the dress code without informing anyone at Crossmark of her condition and without seeking permission to do so.  (P-SUF at ¶ 18.)  She began to wear shorter sleeves or shorter pants, though it is not known for how long or at what frequency she did so.

///

---

[6] The Plaintiff claims to dispute this in P-SUF but only offers disagreement with the justifications of the dress code. Plaintiff does not dispute whether she was **aware** of the dress code.

[7] Notably, the first doctor's note did not state what "medical conditions" Sipple had.

(Id.)   Prior to June 29, Sipple's supervisor Chase Payne ("Payne") informed her that she must comply with the dress code. (Deposition of Chase Payne ("Payne Dep."), ECF No. 15, Ex. A-2 at 55:10-22).   Sipple agreed to comply with Payne's directive. (Id.) She did not mention her condition or the severity of her symptoms at this time, only indicating to him that she was "hot". (Id.) She did not communicate to any of her supervisors that she had a doctor's note at that time.

Thereafter, Payne received an email from an Operations Project Administrator for Crossmark, indicating that Sipple was noncompliant with the dress code and asking Payne to ensure Sipple complied in the future.   (Declaration of Chase Payne ("Payne Decl.") ECF No. 15, Ex. C at ¶ 6.)   On June 29, Payne visited the Walmart store and found that Sipple was again not in compliance with the dress code. (Sipple Dep. at 99:3-7.)   He again asked her to comply. (Id at 110:17-113:6.)   At this point, Sipple informed Payne of the dress code adjustments recommended in her doctor's note and gave Payne a copy of the doctor's note, which he relayed to Crossmark's Human Resources Manager, Cindy Slinker ("Slinker") that day.   (Id.; P-SUF at ¶ 22.)   Payne voiced uncertainty to Slinker with regard to whether Sipple's undefined "medical conditions" could be accommodated and sought advice from her.   (Declaration of Cindy Slinker ("Slinker Decl.") ECF No. 15, Ex. D at ¶ 3.)

///
///
///
///

Slinker responded the next day by contacting Sipple directly. (Ex. 1-6 re MSJ, Ex. 3.) She asked that Sipple fill out a questionnaire. (Id.) The questionnaire asked for detailed information regarding Sipple's alleged disability and how to properly accommodate it. (Exhibits 7-12 re Motion for Summary Judgment ("Ex. 7-12 re MSJ"), ECF No. 23, Ex. 9.)

On July 2, Slinker phoned Sipple and, during the course of the call, Sipple advised Slinker that she was undergoing menopause and provided details about her symptoms. (Sipple Dep. at 126:16-20; Slinker Decl. at ¶ 4.) This is the first time that one of Sipple's supervisors was made aware of the details of her medical condition. Slinker apparently offered Sipple another potential position at the company, but Sipple allegedly declined.[8] (P-SUF at ¶ 29.) Slinker also offered Sipple some alternatives to the dress code such as calf-length pants, but Sipple informed Slinker that she believed the suggested alternatives were insufficient to address her medical needs. (Slinker Decl. at ¶ 5; Sipple Dep. at 129:17-24.) Payne also offered Sipple accommodations including wearing a lab coat with short sleeves underneath, working in the refrigerated section and taking breaks in the refrigerated area.

_____

[8] Sipple argues she was not offered an alternate position. As evidence of the fact that Slinker offered Sipple an alternate position, Defendant provides Slinker's testimonies in her Declaration ¶ 5 and her Deposition at 115:19-116:4. Defendants also offer handwritten notes taken by Slinker during their phone conversation, indicating that Sipple denied Slinker's offer because she "love[s] demoing". Slinker Declaration Exhibit 4. The Court finds the evidence she was offered an alternate position persuasive, but whether Sipple was or was not offered such a position is ultimately immaterial.

(Sipple Dep. at 114:8-17, 291:5-18.) Sipple again rejected these accommodation offers on the basis that they were insufficient. (Sipple Dep. at 114:8-17.)

On July 11, Sipple responded via email to Slinker with the completed questionnaire and attached a facsimile of a more detailed account of her condition from her doctor, which did discuss her menopause. (Sipple Dep. at 139:19-22; Ex. 7-12 re MSJ, Ex. 11.) Slinker then sent Sipple a confirmation of receipt e-mail and contacted Carla Hemyari ("Hemyari"), Crossmark's Director of Personnel Compliance regarding Sipple's accommodations request. (Sipple Dep. at 148:24-149:25.)

In response, Hemyari researched whether menopause is considered a legal disability and whether other employers have accommodated it. (Hemyari Declaration ("Hemyari Decl.") at ¶¶ 3, 4). She also looked into the purpose of the Crossmark dress code for Product Demonstrators. (Id.) Hemyari found that menopause had not been accommodated by other employers and that the dress code was both for contractual purposes and for the safety and sanitation of the food that Product Demonstrators would serve.[9] (Id.)

///

///

---

[9] Sipple points out that the Defendants failed to provide the contract between Walmart and Crossmark, which allegedly includes an agreed-upon dress code between the two. (Plaintiff Georgia Sipple's Memorandum of Points and Authorities in Opposition of Defendant Crossmark, Inc.'s Motion for Summary Judgment ("Pl. Opp. Of MSJ"), page 15, lines 4-6.) The absence of this contract is not material because it is undisputed that Sipple was aware of the dress code and that she deviated from it.

Hemyari then informed Slinker of these findings and advised Slinker that Crossmark could not accommodate Sipple's requested dress code accommodations.  (Id.)[10]

On July 20, Slinker informed Sipple via telephone that Crossmark would be unable to provide the accommodations that she had requested for her menopausal symptoms. (Slinker Decl. at ¶ 10.)  On July 29, Sipple sent an e-mail to Mr. Payne, claiming she was being forced out of her job because Crossmark had denied her accommodation requests and informing Mr. Payne that she was quitting. (Ex. 1-6 re MSJ, Exh. 5).

Sipple filed the present lawsuit on November 3, 2011. Sipple asserts five claims, four of which fall directly under FEHA and one based on the FEHA violations.  The four claims that fall directly under FEHA are for: 1) disability discrimination; 2) retaliation; 3) failure to prevent disability discrimination; and 4) failure to engage in the interactive process. Finally, Sipple adds a claim for wrongful termination based on the alleged FEHA violations.[11]

///

///

---

[10] The record does not clearly indicate the means by which this information was communicated between Hemyari and Slinker.

[11] Sipple also filed claims based on harassment and gender discrimination in her original complaint, but chose not to proceed on those claims in her Memorandum of Points and Authorities in Opposition of Defendants' Motion for Summary Judgment.  As a result, Summary Judgment is entered in favor of Defendants as Sipple has abandoned those claims. See, e.g., Shakur v. Schriro, 514 F.3d 878, 892 (9th Cir. 2008) (holding a Plaintiff "abandoned...claims by not raising them in Opposition to Defendants' Motion for Summary Judgment") (internal quotation and citation ommitted).

Defendants now move for summary judgment, arguing that Plaintiff has failed to proffer sufficient evidence to establish any of their claims, and that Defendants are therefore entitled to judgment as a matter of law on all claims.[12]

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

///

_____

[12] Plaintiff untimely filed her Opposition to Motion for Summary Judgment. However, the Court will still consider it.

Celotex Corp. v. Catrett, 477 U.S. at 323 (quoting Rule 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  Stated another way, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 14 Wall. 442, 448, 20 L. Ed. 867 (1872)).

///

///

As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

Sipple asserts five claims: 1) disability discrimination in violation of Cal. Gov. Code § 12940(a); 2) retaliation in violation of Cal. Gov. Code § 12940(g); 3) failure to prevent disability discrimination in violation of Cal. Gov. Code § 12940(k); 4) failure to engage in the interactive process in violation of Cal. Gov. Code § 12940(m)and(n); and a common law claim for wrongful termination based on the alleged FEHA violations.  Each of these will be discussed in turn.
///

## A.   Disability Discrimination

FEHA discrimination claims under § 12940(a) of the California Government Code are evaluated using the three-stage burden-shifting test established in <u>McDonnell Douglas Corp v. Green</u>, 411 U.S. 792 (1973).  The plaintiff bears the initial burden of establishing a prima facie case of discrimination. The employer then must offer a legitimate nondiscriminatory reason for the adverse employment decision.  Finally, the plaintiff bears the burden of proving the employer's proffered reason was pretextual. <u>Brundage v. Hahn</u>, 57 Cal. App. 4th 228, 236 (1997).

Because the FEHA provisions relating to disability discrimination under the California Government Code are based on federal law under the Americans with Disabilities Act ("ADA"), decisions interpreting federal antidiscrimination laws are relevant in interpreting the FEHA's similar provisions. <u>Brundage</u>, 57 Cal. App. 4th at 235.

An employer is prohibited from discriminating against a disabled employee who can perform the essential duties of her position.  Cal. Gov. Code § 12940(a)(1).  In order to successfully establish a prima facie case (which is the first step of the burden-shifting test discussed above), a plaintiff must show that she 1) suffers from a disability, 2) was otherwise qualified for the job, and 3) suffered an adverse employment action due to her disability.  <u>Scotch v. Art Inst. of California</u>, 173 Cal. App. 4th 986, 1004 (2009).

///

Plaintiffs seek to establish the "suffers from a disability" prong for their prima facie case by demonstrating that Sipple is either actually disabled or regarded as disabled, the first and third definitions of physical disability available.  FEHA's definition of "disability" for the first element of the prima facie case has three disjunctive prongs: 1) actually disabled, 2) a record or history of disability, or 3) regarded as disabled. See Cal. Gov. Code § 12926(l).

### 1.  Sipple's Alleged Actual Disability

A physical disability is cognizable under the FEHA when it satisfies two elements.  **First**, the condition must affect one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic skin, and endocrine.  **Second**, the condition must limit a major life activity.  Cal. Gov. Code § 12926, sub. (l)(1)(A),(B).

### (a)  Affects A Body System

Sipple does not argue that she has a physiological disease that affects one of the listed body systems.  Indeed, Sipple testified under oath that her condition did not affect any of those systems.[13]  (Sipple Dep. at 104:4-105:7.)

---

[13] Although Sipple contends that she did not have the medical expertise to testify as to her medical condition, the fact remains that, in her view, her condition did not affect any

(continued...)

12

Sipple's only contention is that she is undergoing menopause, along with its attendant symptoms.

Further, no case law suggests that menopause qualifies as a disability either under the FEHA or the ADA.  Case law addressing the matter has unequivocally found that menopause is not a disability.  See Klein v. Florida Dept. Of Children and Families Serv., F. Supp. 2d 1367, 1372 (S.D. Fla. 1998) (holding that "[m]enopause, generally, is not a handicap or disability"); Saks v. Franklin Covey Co., 117 F. Supp. 2d 318, 326 (S.D.N.Y. 2000) (holding that infertility is not a disability per se and that menopause does not affect the reproductive body system as pertaining to the ADA or FEHA because it is a natural progression); McGraw v. Sears, Roebuck & Co., 21 F. Supp. 2d 1017, 1021 (D. Minn. 1998) (holding that menopause is not a disability).

Likewise, this Court is not willing to recognize menopause as a disability per se.  Menopause is a natural progression over time, like gradually losing one's keen sense of vision or hearing.  It is an inevitable part of the human condition for women. While the effects of menopause may constitute a disability if shown to affect a body system as defined by the FEHA and if shown to sufficiently limit a major life activity, menopause is not recognized by this Court to be a disability per se under the FEHA.

///

///

_____

[13](...continued)
of those systems.

13

Similarly, with regard to Sipple's alleged symptoms that result from her menopause, Sipple has failed to 1) claim that her condition affects one of the body systems listed in the California Government Code; much less 2) claim that any of the debilitating effects of her menopause affect a particular body system; or 3) provide any medical evidence of any of the above.

Therefore, this Court holds that Sipple's condition is not an actual physical disability under the FEHA.

**(b)   Whether alleged actual physical disability limits a "major life activity"**

Furthermore, Sipple has not demonstrated that her medical condition limits any major life activity under the California Government Code's definition of major life activities, which includes "physical, mental, and social activities, and working." Cal. Gov. Code § 12926, sub. (l)(1)(B)(iii).

In her deposition, Sipple admitted that her menopausal condition does not limit her ability to eat, drink, walk, talk, see, breathe, her, sit, stand, read, hold things, lift things, or even work.  (Sipple Dep. 104:4-105:7.)

Sipple's most persuasive contention is that, due to her condition, she can no longer work and therefore is limited in a major life activity.  However, Sipple provides insufficient evidence demonstrating that she cannot work.  Rather, she only contends that she cannot work as a product demonstrator at Crossmark given the dress code.

///
///

14

See Fraser v. Goodale, 342 F.3d 1032, 1040 (9th Cir. 2003) (noting that "just because a certain broad activity is of central importance to most people's daily lives does not mean that every sub-type of the activity is also a major life activity"). Here, Sipple does not demonstrate that she cannot work altogether. Instead, she only argues that she cannot work wearing the particular uniform for this particular position. Further, she never asked to be moved to a different department or even to the refrigerated section of the store.[14] Therefore, the Court cannot reasonably conclude that Sipple cannot "work" just because she claims she cannot perform the specific duties she was assigned as a product demonstrator. See, e.g., id. (holding that, "eating is a major life activity. However, eating specific types of foods, or eating specific amounts of food, might or might not be a major life activity. If a person is impaired only from eating chocolate cake, he is not limited in a major life activity because eating chocolate cake is not a major life activity."

Sipple's current position is analogous to the "chocolate cake" discussed in Fraser. See id. Her alleged inability to work in the specific product demonstrator job for Crossmark only limits in terms of her ability to perform one position. It does not bear on her ability to work in general. Accommodations could have potentially given her the opportunity to continue to participate in the major life activity of working, but she did not accept any of those offers or even try them.

///

----

[14] Defendants have provided persuasive evidence that they offered Sipple, but she refused, such accommodations.

To return to <u>Fraser</u>'s cake analogy, she refused other foods after claiming that she could not eat the chocolate cake. Because of her refusal, the Court cannot conclude that she is limited in her ability to eat, but only that she is limited in her ability to eat the specific chocolate cake she wanted in the manner she wanted to eat it.  The Court therefore concludes that Sipple has not stated that her condition limits any major life activity.

### 2.   "Regarded" as Disabled

A plaintiff can also establish the "suffers from a disability" element of her prima facie claim for disability discrimination if she can demonstrate that she was "regarded" or "treated" as if she had a physical condition that made achievement of a major life activity difficult.  Cal. Gov. Code § 12926, sub. (l)(4),(5).

As stated in the California Government Code, "It is the intent of the Legislature that the definitions of physical disability and mental disability be construed so that applicants and employees are protected from discrimination due to an actual or perceived physical or mental impairment that is disability, potentially disabling, or perceived as disabling or potentially disabling."  Cal. Gov. Code § 12926.1, sub. (b).  In other words, the purpose of the "regarded or treated" definition of disability is to protect employees who are thought to be disabled by their employer and are wrongly discriminated against by the employer based on that perception.  <u>Id.</u>

In discussing this added definition of disability under the ADA, the U.S. Supreme Court explained the rationale of the definition: "By amending the definition of 'handicapped individual' to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." Sch. Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 284 (1987) (in reference to the ADA's reasoning for adding this "regarded or treated" definition of disability).

Here, Sipple claims that Crossmark considered her to have a physical condition that made a major life activity – her work as a product demonstrator for Crossmark - difficult to achieve.  As evidence, Sipple relies on her doctor's note which was received by Payne and passed to Slinker.

However, the receipt of an accommodations request does not constitute recognition of a disability.  For example, in Aucutt v. Six Flags Over Mid-America, Inc., 65 F.3d 1311 (8th Cir. 1996), the Eighth Circuit affirmed the district court's granting of the defendant's motion for summary judgment based on the fact that mere knowledge of an employee's medical problems does not show that the defendant regarded the employee to have an impairment which limited his ability to perform major life activities.

///
///

17

Similarly, in <u>Foreman v. Babcock & Wilcox Co.</u>, 117 F.3d 800 (5th Cir. 1997) the Fifth Circuit also affirmed summary judgment for the defendant, holding that even when the employer believes the employee is incapable of performing a particular job, that does not mean that the employer "regarded" the employee to be disabled.

Here, the evidence only demonstrates that Sipple had requested accommodations at the advice of a doctor.  This does not demonstrate that the defendant "regarded" or "treated" Sipple as having any particular impairment at all.  In fact, Dr. Raitt's note, which Sipple passed along to Crossmark, did not even state what medical condition or disability Sipple had developed.

Most importantly, nothing indicates that Payne nor any other employee of Crossmark regarded Sipple to have any particular disability.  They did not suggest that she needed to take another job, nor is there evidence that they behaved in a way which indicated they found her incapable of performing her job.  For the "regarded" definition of disability to apply, Defendants must have acted as though Ms. Sipple could not perform a major life activity, but that is simply not the case here.  In sum, Plaintiff fails to demonstrate that Crossmark "regarded" her to be disabled.

Sipple also fails to satisfy the purpose of the "regarded" definition of physical disability under the FEHA.  The purpose of this - to protect people who are incorrectly regarded as being disabled and are discriminated against based on that regard - does not apply here.

///

18

As mentioned above, the Supreme Court stated that the "regarded" definition of physical disability under the ADA was intended to protect those thought to be disabled from the ". . . .myths and fears about disability and disease. . . ." Sch. Bd. at 284. Because there is no persuasive evidence that Crossmark acted in a discriminatory manner towards Sipple, and because Sipple cannot demonstrate that Crossmark even "regarded" or "treated" her as having a disability such that she could not perform a major life activity, she cannot establish that she was "regarded" as disabled.

Because Sipple cannot establish that she was 1) actually physically disabled nor that 2) her condition limited a major life activity, and because she cannot establish that she was 3) regarded or treated as though she were disabled, she cannot establish the first element of the prima facie case for disability discrimination under the FEHA.

And because the first element of the prima facie case cannot be found by a reasonable trier of fact to have been fulfilled, the Court need not address the other elements of a discrimination claim.  Therefore, Sipple's Discrimination Claim under the FEHA is denied as a matter of law.

**B.   Retaliation Claim**

Section 12940(h) of the Cal. Gov. Code prohibits an employer from discharging, expelling, or otherwise discriminating "against any person because the person has opposed any practices forbidden under [Section 12940]."

In order to determine whether an employer has wrongfully discriminated against an employee in retaliation, Plaintiff must establish that 1) he/she engaged in protected activity, that 2) the employer subsequently subjected the employee to an adverse employment action, and 3) there exists a causal link between the protected activity and the employer's adverse employment action. Yanowitz v. L'Oreal, 36 Cal. 4th 1028, 1042 (2005).  Once an employee establishes a prima facie case, the employer must offer a legitimate, nonretaliatory reason for the adverse employment action.  Id.  If the employer is successful, the burden shifts back to the employee to prove intentional retaliation.  Id.

In order to establish Sipple's prima facie case, she must first demonstrate that she engaged in protected activity under the FEHA.  Yanowitz, 36 Cal. 4th at 1042.  To determine what protected activity is, the Court often looks for guidance to decisions construing federal antidiscrimination laws, including Title VII of the Federal Civil Rights Act of 1964.  Chavez v. City of Los Angeles, 47 Cal. 4th 970, 984 (2010).  Therefore, both federal and state discrimination law concerning what constitutes "protected activity" are persuasive.

To constitute protected activity, an employee's conduct "must have alerted his employer to his belief that discrimination, not merely unfair personnel treatment, had occurred."  Jurado v. Eleven-Fifty Corp., 813 F.2d 1406, 1412 (9th Cir. 1987) (finding employee complaint regarding scheduling change not protected activity).  Other cases regarding both Title VII and FEHA speak to what qualifies as protected activity. ///

See, e.g., Barber v. CSX Distrib. Servs., 68 F.3d 694, 701–702 (3rd Cir. 1995) (finding employee complaint regarding promotion decision not protected activity); Lanagan v. Santa Cruz County Metro Transit Dist., 2010 WL 1838984, at *5–6 (N.D. Cal. 2010) (report of co-employee's negligence "not protected activity [under FEHA] because it has nothing to do with the FEHA's prohibitions").

At a minimum, the employee must have alerted her employer that she felt discriminated against and must have reasonably believed that the employer had engaged in unlawful employment practice. Jurado, 813 F.2d at 1412.

Here, Sipple does not adequately demonstrate that her activities were "protected". She argues that her requests for dress code accommodations were protected activities. (Pl. Opp. Of MSJ, p. 18, lines 5-24.) However, as discussed above, the employer must be alerted that the employee believes she is being discriminated against in order for the activity to become protected. The California Supreme Court stated, "The FEHA should be liberally construed to deter employers from taking actions that would discourage employees *from bringing complaints* that they believe to be well founded." Miller v. Dep't of Corrections, 36 Cal. 4th 446, 475 (2005) (emphasis in original). In other words, the retaliation section of the FEHA is intended to protect employees from employers who act against an employee in retaliation for being accused of discrimination. However, here, a reasonable trier of fact simply could not conclude that asking for dress code accommodations is sufficient notice to the employer that the employer is being accused of discrimination.

21

Even when Sipple informed Crossmark that she was experiencing menopause and sought accommodations, there is no plausible evidence that anything Sipple told Crossmark indicated to her supervisors that she viewed them to be acting against her in a discriminatory manner. (Pl. Opp. Of MSJ, p. 18, lines 5-24.)  In her Opposition to Defendants' Motion for Summary Judgment, Sipple discusses her conversations with Crossmark, but does not address the most fundamentally important issue for this element of the prima facie case: Why that activity would qualify as protected. (Id.)  Sipple's only contention is that she had complained to Crossmark about her condition and that Crossmark responded in a delayed manner. (Id.)

Sipple never even addresses whether she ever explicitly or implicitly expressed to anyone at Crossmark that she felt she was being discriminated against due to her condition.  (Id.) Sipple's strongest potential argument could be that her repeated complaints allowed Crossmark to infer that she felt she was being treated unfairly.  But even if Crossmark could infer that Sipple felt she was being unfairly treated, that would not mean that Crossmark was aware that Sipple felt she was a victim of discrimination.  See Juardo, 813 F.2d 1406 at 1412 (9th Cir. 1987).

///
///
///
///
///
///

22

A retaliation claim is inapplicable to this case. In Sipple's deposition, she only indicated that she had a conversation in which she told Payne about her condition: she did not raise any issues that would indicate a discrimination concern.[15]  Payne also stated that Sipple never indicated she felt discriminated against on the basis of her menopause, stating, "Georgia Sipple never complained to me that she felt she was being discriminated against on the basis of her age, gender, or disability."  (Payne Decl. ¶ 13.)

Therefore, Sipple does not provide evidence sufficient for a reasonable trier of fact to conclude that Crossmark was aware that Sipple was accusing Crossmark or any Crossmark employee of discrimination. As a result, Sipple cannot establish a prima facie case against Crossmark for retaliation because Crossmark was not made aware that they were being accused of discrimination in the first place.  There was nothing for Crossmark to retaliate against.  Because the first element of the prima facie case for retaliation under the FEHA fails, the Court need not address the other elements of the prima facie case.

Accordingly, Crossmark's Motion for Summary Judgment with regard to Plaintiff's Retaliation Claim is GRANTED.

///

---

[15] See Sipple Dep. at 177: 8-16:

I couldn't remember the exact words or conversation with [Payne] as far as . . . me being a female and getting - I mean it's kind of like it's all rolled into one, menopause, women, it's older women, so it's all rolled into one. I mean, I didn't just address just my age or address just on being a female . . . .

23

**C.  Failure to Prevent Disability Discrimination and Retaliation Claims**

The FEHA creates a statutory tort when an employer "fail[s] to take all reasonable steps necessary to prevent discrimination and harassment from occurring."  Cal. Gov. Code § 12940(k). However, no action lies for failure to take necessary steps to prevent discrimination or harassment if no such conduct in fact occurs:  "Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented."  <u>Trujillo v. N. County Transit Dist.</u>, 63 Cal. App. 4th at 280, 289 (1998).

Because Sipple's claims for disability discrimination and retaliation have both failed, Sipple cannot establish her failure to prevent claim under 12940(k) of the Cal. Gov. Code.

Defendant Crossmark's Motion for Summary Judgment with regard to Plaintiff's 12940(k) claim is GRANTED.

**D.  Failure to Engage in the Interactive Process**

Section 12940(n) of the California Civil Code allows for relief for a Plaintiff when an employer:

> fail[s] to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition.

///
///
///

24

Importantly, this section distinguishes between a medical condition and a disability.  Therefore, Plaintiff's claim based on this section will not be dismissed based on the Court's finding above that she does not have a disability for purposes of the FEHA.  However, the Court holds that no reasonable trier of fact could find that Crossmark failed to engage in a timely, good faith interactive process with Sipple.

Sipple's evidence of a failure to engage in the interactive process on behalf of Crossmark is inadequate.  Sipple points to a couple of instances in which she initiated discussions with Crossmark regarding her condition.  (Pl. Opp. Of MSJ, p. 21, lines 2-6.)  The fact that Sipple, rather than Crossmark, initiated these discussions does not indicate that Crossmark failed to engage in the process, considering that Crossmark was not the one asking for accommodations and would therefore be expected to be primarily responsive rather than proactive.  See King v. UPS, Inc., 152 Cal. App. 4th 426, 443 (2007) (noting the "interactive process of fashioning an appropriate accommodation lies primarily with the employee" [citing Spitzer v. The Good Guys, Inc., et. al., 80 Cal. App. 4th 1376, 1384 (2000)]).

Sipple also notes one instance in which Slinker did not respond to a communication Sipple sent to Slinker.  (Pl. Opp. Of MSJ, p. 21, lines 7-24.)  However, Sipple omits the ongoing dialogue between her and various Crossmark employees that occurred from late June through most of July.  (Id.)

///

///

///

As discussed at length in the Background Section of this Order, during that period, numerous interactions between Sipple and Crossmark occurred in which Crossmark was exploring options and offering accommodations to Sipple.[15]   (See supra at pages 4-7.) By the time these interactions were all completed, the process had been completed. In short, the Court concludes Crossmark employees informed Sipple that they could not accommodate her in the way she wanted.

Cal. Gov. Code § 12940(k) only requires that the employer engage in the interactive process.  It does not require that the employer actually accommodate the employee in any way, but rather only requires that those requests are heard and considered in good faith.  The facts make clear that Crossmark was engaged in the interactive process to accommodate Sipple's condition.

Defendant's Motion to Dismiss Plaintiff's Claim under Cal.

_____

[15] Examples Crossmark's participation in the interactive process include:

1. Payne relayed Sipple's requests for accommodations to Slinker and sought advice.  (Slinker Decl. ¶ 3.)

2. Slinker e-mailed Sipple the next day and requested that she fill out a questionnaire. (Ex. 1-5 re MSJ, Ex. 3.)

3. Slinker called Sipple to further discuss her condition and allegedly offered her a job, though that fact is disputed.  (Sipple Dep. at 126:16-20.)

4. Slinker offered Sipple alternatives to dress code, such as calf-length pants, which Sipple denied without trying.  (Sipple Dep. 129:17-24.)

5. Payne offered accommodations such as working in the refrigerated section, taking breaks in the refrigerated section, and wearing a lab coat with short sleeves, all of which were rejected by Sipple before she tried them. (Sipple Dep. at 114:8-17, 291:5-18.)

Gov. Code § 12940(k) is GRANTED.

**E.    Wrongful Termination in Violation of Policy**

Plaintiff's public policy claim for wrongful termination must fail because the Defendants did not violate the FEHA. As held in <u>Sanders v. Arneson Products</u>, 91 F.3d 1351 at 1354 (9th Cir. 1996), in reference to the Plaintiff's failure to demonstrate that the Defendant violated the ADA, the Court stated there can be "no public policy claim against employers who have not violated the law."

Because Sipple has failed to establish that Crossmark violated any laws, Crossmark's Motion for Summary Judgment against Plaintiff's claim for wrongful termination must be GRANTED as a matter of law. [16]

///
///
///
///
///
///
///
///
///

---

[16] In terms of Plaintiff's alleged constructive discharge, Plaintiff's only relevant evidence is that she interpreted a discussion with Slinker to imply that she should either comply with the dress code or quit.  This fact is heavily disputed and its veracity is questionable, as discussed above.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment (Docket No. 15) is GRANTED in full.  The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated: July 6, 2012

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE